IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

SULEIMAN ZAKARIA                    *

    Petitioner,                 *

                         *   CIVIL NO.:     WDQ-13-2918

        v.                      CRIMINAL NO.:  WDQ-10-0043

                         *

UNITED STATES OF AMERICA,           *

    Respondent.                 *

                         *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Suleiman Zakaria was convicted for importing heroin into the United States and possessing heroin with the intent to distribute. Pending is Zakaria's *pro se* motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. A hearing was held on October 14, 2015. For the following reasons, Zakaria's motion will be denied.

I.   Background

  A. Criminal Conduct and Trial

On January 26, 2010, Zakaria entered the United States from London, England at the Baltimore Washington International Airport. ECF No. 1 at 3. Zakaria's flight originated in Accra, Ghana. *Id.* When officers of United States Customs and Border Protection searched Zakaria's luggage, they found approximately three kilograms of heroin concealed within the lining of

Zakaria's suitcase.  *Id.*  After Zakaria was informed of his *Miranda* rights, he "refused to speak to the Agents and requested the presence of a lawyer."  *Id.*  On February 2, 2010, a federal grand jury issued an indictment charging Zakaria with importing one kilogram or more of heroin into the United States in violation of 21 U.S.C. § 952, and possession with intent to distribute heroin in violation of 21 U.S.C. § 841.  ECF No. 8.

On September 13, 2010, Zakaria's trial counsel--James Wyda, Esq. and Michelle Engert, Esq.--informed the government that they intended to introduce the testimony of an expert witness, Dr. Lawrence Donner,[1] who performed an independent medical examination of Zakaria.  ECF No. 26-1.  Counsel represented that Donner would

> present evidence relating to the mental condition of Mr. Zakaria, bearing on the issue of guilt.  He will testify about Mr. Zakaria's intelligence quotient and intellectual functioning and about the data and tests on which he bases his expert opinion.  This data will include information on his mathematical and verbal skills, personal background information, employment information, and family information.

*Id.* at 2.

On September 15, 2010, counsel filed notice of expert testimony and evidence of a mental condition.  ECF No. 22.  The notice emphasized that the defense was not seeking Dr. Donner's

---

[1] Dr. Donner, clinical and forensic psychologist licensed in Maryland, is certified by the American Board of Professional Psychology and has more than 30 years' experience.

2

testimony "in support of an insanity defense or on the issue of competency to stand trial." *Id.* at 1.   The motion further asserted that the "testimony [would] be limited in scope to the IQ testing that [Dr. Donner] performed on Mr. Zakaria . . . [and] will testify about the general characteristics of individuals who have these scores . . . ." *Id.*

On September 20, 2010, the government moved to exclude the expert testimony as irrelevant because Dr. Donner was only opining about Zakaria's general intelligence, not Zakaria's knowledge of whether he possessed an illegal substance.   ECF No. 26 at 4.   To its opposition, the government attached Dr. Donner's September 16, 2010 report for the Court's review.   *See* ECF No. 30.

Dr. Donner evaluated Zakaria in-person on September 8, 2010.   *See* ECF No. 26-1 at 2.   In his report, Dr. Donner noted that Zakaria arrived 15 minutes early for his scheduled appointment, and "was soft spoken, polite, and showed good eye contact with the examiner."   ECF No. 30 at 2.   Zakaria acted in a "responsive, deferent, and cooperative manner."   *Id.*   Dr. Donner detailed Zakaria's family and education history, including that Zakaria attended secondary school in Ghana, but tended to receive poor scores.   *Id.* at 3.   His best grades were in "Moral Education" and "Physical Education."   *Id.* at 4.

3

The IQ tests run by Dr. Donner revealed that Zakaria "falls in the lowest part of the 'borderline' range of intellectual functioning," with an IQ of 70.  ECF No. 30 at 4.  Dr. Donner concluded that Zakaria suffered from a learning disability and likely had "limitations with concentration and attention, vocabulary, arithmetic reasoning, ability to abstract, and dealing with complex stimuli."  *Id.* at 5.  Dr. Donner also noted that Zakaria's "cognitive performance skills fall into the mentally retarded range," and he was "functioning more than three grades behind his academic experience in reading, spelling and arithmetic . . . ."  *Id.*

Other than the IQ assessments, Dr. Donner did not diagnose Zakaria with a mental illness.  Further, nowhere in his report did Dr. Donner conclude that Zakaria was incompetent to stand trial or unable to participate in his own defense.  In fact, Dr. Donner noted that Zakaria "appear[ed] to try and minimize his intellectual limitations and shortcoming from others and even himself."  *Id.*

On September 27, 2010, at the start of trial, the Court held a hearing on the outstanding motion in limine.  Zakaria's counsel argued that Dr. Donner's report showed that people with low IQ are "more trusting than others, and less cautious . . . ."  ECF No. 86-1 (hearing transcript) at 8.  According to counsel, this information was relevant to show why Zakaria might

4

have trusted someone else to pack his suitcase.  *Id.*  However,
when questioned, counsel admitted that the report did not
contain any information about how low-IQ individuals act in
their day-to-day lives.  *Id.* at 10.  The government argued that
there was "no link between having an eighth-grade reading score
and the elements of [the] case."  *Id.* at 15.  The Court excluded
Dr. Donner's testimony as irrelevant because he "did not opine
about Zakaria's knowledge of the heroin in his bag or his lack
of criminal culpability because of his intelligence."  ECF No.
54 at 3.

On October 1, 2010, the jury returned a verdict of guilty
on both counts.  ECF No. 51.  On January 28, 2011, Ms. Engert
submitted a sentencing memorandum in which she argued that the
Court should consider Zakaria's "achievements" considering "his
low intellectual functioning."  ECF No. 56 at 2.  Ms. Engert
directed the Court's attention to Dr. Donner's report, and again
argued that Zakaria's low IQ made him "overly trusting and
easily taken advantage of by others."  *Id.*  On February 2, 2011,
the Court sentenced Zakaria to 120 months imprisonment.  ECF No.
58.

On February 10, 2011, Zakaria appealed the Court's decision
to exclude Dr. Donner's testimony.  ECF No. 60.  On March 15,
2011, the Fourth Circuit affirmed the Court's ruling.  ECF No.
73.

B. *Pro se* § 2255

On October 3, 2013, Zakaria moved *pro se*[2] to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.  ECF No. 79.  Zakaria asserts that his trial counsel was ineffective for seven reasons:

> (1) failing to timely investigate [Zakaria's] diminished mental capacity, mental retardation, and its prejudicial impact on his meaningful ability to communicate with counsel, assist in his defense, and fully understand and comprehend all available options; (2) communicating with [Zakaria] legal advice and options at a time he could not understand, comprehend, or act upon the same without the aid of a mental health professional due to his diminished mental capacity and mental retardation; (3) involving [Zakaria] in the plea negotiation process at a time that he could not meaningfully understand, comprehend, or obtain the benefits of pleading guilty without the aid of a mental health professional; (4) failing to request and retain the services of a mental health expert to assist [Zakaria] to understand and comprehend Counsel's legal advice with regards to the charges, applicable law, and available defenses and options, including the plea negotiation process and the benefits of pleading guilty; (5) failing to advise the Court that a Competency Hearing was needed pursuant to 18 U.S.C. § 4241 to determine [Zakaria's] understanding and comprehension of his options, including a plea bargain; (6) failing to have a Competency Hearing performed, pursuant to 18 U.S.C. § 4241 to ascertain [Zakaria's] ability to meaningfully communicate with counsel, assist in his defense, and fully understand and comprehend all available options; (7) failing to effectively present mitigating evidence in relation to [Zakaria's] mental capacity.

ECF No. 79 at 5.

---

[2] Although filed without the benefit of counsel, Zakaria did not actually prepare his § 2255 motion.  Because of Zakaria's intellectual abilities, another prisoner wrote the motion for him.

According to Zakaria, when he first met with counsel, he "did not fully comprehend the charges . . . nor the potential punishment due to [his] diminished mental capacity." ECF No. 79-1 at 2. Zakaria told counsel "of the severe head injury [he] sustained as a child,"[3] and "attempted to explain as best [he] could, how the injury impaired [his mental capacity and comprehension of simple to complex issues." *Id.* At the meeting, Ms. Engert explained the possible sentence for the charges, and the benefits of a guilty plea, but recommended not accepting a plea. ECF No. 79-1 at 2-3.[4] Zakaria asserts that if his counsel had been effective, "he would have been afforded the opportunity to enter into a plea agreement with the [g]overnment, would have done so, the Court would have accepted the terms, and he would have received a lesser charge or sentence or less prison time." *Id.*

On December 18, 2013, the government opposed Zakaria's motion. ECF No. 86. On March 25, 2015, the Court ordered appointment of counsel for an evidentiary hearing.

---

[3] Zakaria's assertion that he told counsel about a severe childhood head injury contradicts what he told Dr. Donner. When questioned by Dr. Donner, Zakaria "denie[d] suffering any head injuries or loss of consciousness" as a child, but "acknowledged being knocked out and falling on his head at least twice while playing soccer as a teenager." ECF No. 30 at 3.

[4] Although Zakaria says that he talked with Ms. Engert about a plea *generally*, there is no evidence that a plea was ever offered or rejected.

C. The Evidentiary Hearing[5]

On October 14, 2015, the Court held an evidentiary hearing for Zakaria's § 2255 motion.  At the beginning of the hearing, Zakaria's counsel informed the Court that she would "not be advancing" Zakaria's competency arguments; and, although she would not be withdrawing the arguments, she was "not planning to put forth any evidence that [Zakaria] was incompetent to stand trial."[6]  Instead, counsel would present evidence on what she called Zakaria's "lack of understanding."

1. Zakaria's Testimony

Zakaria testified that he grew up in Ghana, and that his native language is Hausa.  Although he began learning some English when he was 13, he has never spoken it regularly.[7] Zakaria also testified that when he was 11 or 12 years old he hit his head on a rock while playing soccer and was hospitalized for six months.  After the injury, he started having trouble in

---

[5] To produce this opinion as soon as practicable, the hearing testimony is summarized from the Court's notes rather than waiting for an official transcript.

[6] The Court verified that counsel had discussed this decision with Zakaria, and gave her time in the courtroom to confer with Zakaria on the matter.

[7] Zakaria never requested and did not have an interpreter at the hearing.  He answered counsel's questions in English, and, although questions had to be repeated on a few occasions, showed an understanding of the questions posed to him.  Zakaria says that he possesses a better understanding of English now than at the time of his trial because of his experience in prison.

school, and was eventually assigned a one-on-one instructor who would teach things more slowly, and "break things down" for Zakaria to understand.

In 2001, Zakaria moved to the United States, but did not speak English regularly because he lived in a Ghanaian household.   Zakaria never went to school in the U.S., although he has attempted the test to earn his GED many times.   Zakaria held several jobs in the U.S., including security guard, child care worker, and home health aide.   For many of these positions, he had to take at-home tests to earn a certification.   Zakaria testified that a family member would help him take the tests, and explain the questions in a way he understood.

Zakaria testified that after his arrest, he knew he was charged with a drug offense but did not understand what a mandatory minimum sentence was or that if he was convicted, he would be facing ten years in prison.   He also stated that when Ms. Engert took him to a meeting with the government, he did not understand the purpose of the meeting.[8]   Zakaria asserts that the first time he learned of the mandatory minimum sentence was

---

[8] Zakaria also testified that he understood Dr. Donner much better than Ms. Engert because Dr. Donner used "small English," went slowly, and broke things down.   Notably, counsel never asked Zakaria if he told Ms. Engert that he was having issues understanding her in any way.

To the contrary, during the hearing, Zakaria stated that he does not like seeming "slow."   This is similar to Dr. Donner's observation that Zakaria tries to hide his disabilities from others.

after his conviction, during his presentence interview with a probation officer.  Had he understood the mandatory minimum sentence, Zakaria asserts that he would have entered into a plea agreement with the government.

During cross examination, the government questioned Zakaria about the potential plea agreement, and the information that Zakaria would have provided under the safety valve provision. Zakaria revealed that prior to his trial, his brother visited him to talk about his trial because Zakaria's brother and cousin were the individuals smuggling the drugs.  According to Zakaria, his brother told him not to talk to the police because his brother knew police officers who would take the evidence before Zakaria's trial, and Zakaria would go free.  Zakaria's mother who was ill with cancer also urged Zakaria to obey his brother.

Zakaria testified that he obeyed his brother's advice and did not tell Ms. Engert or the government about these conversations or his brother's involvement.  Zakaria only told Ms. Engert that his cousin had packed his suitcase.

2. Ms. Engert's Testimony[9]

Ms. Engert testified that she began representing Zakaria at his initial appearance.  When questioned about Zakaria's allegations in his affidavit that she did not communicate to him the nature of the charges against him or the mandatory minimum sentence at their initial meeting, Ms Engert stated that although it is her standard practice to go over the criminal complaint with her clients when the first meet in lock-up, she did not remember her meeting with Zakaria.  The focus of the meeting, however, was on conditions of release, not on the charges.[10]

After the initial appearance, Ms. Engert met Zakaria in-person between five and 15 times, and spoke with him on the phone several other times.  Ms. Engert asserts that she explained the charges, the mandatory minimum sentence, and the safety valve provision.  She also talked with Zakaria seven to

---

[9] Other than Zakaria's testimony, counsel only submitted Dr. Donner's report.  She argued that Zakaria failed to understand his choices during his trial, but never stated that the lack of understanding was Ms. Engert's fault.  Therefore, the government moved for the Court to issue its decision before the government provided any evidence.  The Court denied the motion based solely on the representations in Zakaria's affidavit that Ms. Engert failed to communicate with him and provided incorrect legal advice.  Accordingly, the government called Ms. Engert as a witness.

[10] Ms. Engert was able to get Zakaria released.

nine times about taking a plea.[11]  Engert testified that she told

Zakaria that he was unlikely to win at trial, and, without the

safety valve provision, would face ten years in prison.

Zakaria, however, was adamant about going to trial because he

did not want any prison time.  Several other employees of the

Federal Public Defender also attempted to talk to Zakaria about

a plea.  Zakaria and Ms. Engert also met with the government for

a reverse-proffer, after which Zakaria rejected a plea.

The government also questioned Ms. Engert about why she had

Zakaria examined by Dr. Donner.  Ms. Engert stated that she only

sought Dr. Donner's testimony in order to pursue the legal

argument for trial that Zakaria did not have the necessary *mens

rea*.  Ms. Engert said that she was worried that a jury would

hold Zakaria to the standard of a "reasonable person," and that

Zakaria did not function at the level, so she sought Dr.

Donner's evaluation to find out how Zakaria's "mind worked."[12]

Ms. Engert testified that she did not even consider

requesting a competency hearing or having Dr. Donner offer an

opinion on competency because she never believed competency was

---

[11] Ms. Engert asserts that the offer from the government was for
Zakaria to plead guilty and provide information.  In exchange,
the government would either recommend a sentence of five years,
or not oppose a sentence of five years, under the safety valve
provision of the Sentencing Guidelines.

[12] Ms. Engert also interviewed family members about Zakaria's
capabilities.

an issue.  Although Zakaria had intellectual disabilities, Ms. Engert met with him on many occasions, she thought she knew him "rather well," she believed that he was competent, and never thought that he did not understand her explanations.

On cross examination, Ms. Engert admitted that after receiving Dr. Donner's report about Zakaria's cognitive disabilities, she never consulted Dr. Donner about how best to communicate with Zakaria, and did not change how she communicated with Zakaria.  Ms. Engert stated that she did not think these steps were necessary.

II.  Analysis

A. Legal Standard

The Sixth Amendment guarantees the effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Sixth Amendment also guarantees effective assistance of appellate counsel on direct appeal from a criminal conviction. *Evitts v. Lucey*, 469 U.S. 387, 396-400, 105 S. Ct. 830, 836-38, 83 L. Ed. 2d 821 (1985); *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000).  To prove ineffective assistance, Braxton must show: (1) counsel's performance was deficient and (2) the deficiency prejudiced his defense.  *Strickland*, 466 U.S. at 687.  To show deficient performance, Braxton must establish that counsel made errors so serious that the "representation fell below an objective standard of reasonableness."  *Id.* at 688.  There is "a

strong presumption that counsel's conduct was within a wide range of reasonably professional conduct." *Kratsas v. United States*, 102 F. Supp. 2d 320, 322 (D. Md. 2000) *aff'd*, 9 F. App'x 107 (4th Cir. 2001) (*citing id.* at 688-89). The performance of appellate counsel is also entitled to the "presumption that [counsel] decided which issues were most likely to afford relief on appeal." *Fisher v. Lee*, 215 F.3d 438, 457 (4th Cir. 2000) (*citing Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993). Appellate counsel is not obligated "to assert all non-frivolous issues on appeal." *Id.* (*citing Smith v. South Carolina*, 882 F.2d 895, 899 (4th Cir. 1989).

To show prejudice, Braxton must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  If a defendant cannot prove prejudice, "a reviewing court need not consider the performance prong." *Fields v. Attorney Gen. of Md.*, 956 F.2d 1290, 1297 (4th Cir. 1992) (*citing id.* at 697).

B. Zakaria's Competency Claims[13]

It is well-settled that "[a]n attorney's duty, of course, does not mandate the exploration of the issues of sanity and/or competency in every instance." *Wood v. Zahradnick,* 430 F. Supp. 107, 111 (E.D. Va. 1977), *aff'd,* 578 F.2d 980 (4th Cir.1978). However, if "the facts known and available, or with minimal diligence accessible, to defense counsel raise a reasonable doubt as to a defendant's mental condition, counsel has an affirmative obligation to make further inquiry" into a defendant's competency. *Id.* If the facts available raise a reasonable doubt about a defendant's competency, a lawyer "'is not entitled to rely on his own belief about a defendant's mental condition,' but instead must make a reasonable investigation when the facts known and available raise a question as to a defendant's competence." *Mann v. United States*, 66 F. Supp. 3d 728, 736 (E.D. Va. 2014) (quoting *Becton v. Barnett,* 920 F.2d 1190, 1192 (4th Cir.1990)).

"Importantly, demonstrating ineffective assistance of counsel does not require proof of incompetence under the test set out in *Dusky v. United States,* 362 U.S. 402, 80 S. Ct. 788,

---

[13] Zakaria's first six claims of error can be combined into two analyses. First, that counsel failed to investigate Zakaria's incompetency or request a competency hearing. Second, the argument advanced at the evidentiary hearing, that Zakaria did not understand his choices.

4 L.Ed.2d 824 (1960)."[14]  *Mann v. United States*, 66 F. Supp. 3d
at 736.  "Rather, defective performance is established if it is
shown that '[h]ad counsel taken reasonable steps to investigate,
a hearing could have been held on the issue of . . . competency,
and the *Dusky* standard would have been applied at that time.'"
*Id.* (quoting *Becton*, 920 F.2d at 1194).[15]

    *Wood v. Zahradnick* and *Becton v. Barnett* are the exemplar
cases in this Circuit for when an attorney was ineffective in
failing to address his client's competency to stand trial.  *See*
*Mann*, 66 F. Supp. 3d. at 738-39 (discussing *Wood* and *Becton*).
In *Wood*, the petitioner was a 27-year old heroin addict who

---

[14] The test for determining competency under *Dusky* is whether the
defendant "ha[d] sufficient present ability to consult with his
lawyer with a reasonable degree of rational understanding—and
whether he has a rational as well as a factual understanding of
the proceedings against him."  362 U.S. at 402.

[15] In some cases, courts have concluded that no prejudice existed
under the second prong of *Strickland* because the defendant was
competent under *Dusky*.  *See United States v. Basham*, 789 F.3d
358, 383-84 (4th Cir. 2015) ("Put simply, Basham was competent
during the September 20 and October 24 incidents, foreclosing
any suggestion that his trial was rendered unfair by his
lawyers' decisions during those incidents."); *Walton v.
Angelone*, 321 F.3d 442, 462 (4th Cir. 2003); *Beck v. Angelone*,
261 F.3d 377, 393 (4th Cir. 2001).  However, in all of these
cases, the court was also asked to substantively determine
competency as a separate ground for error not simply ineffective
assistance, or the court had determined competency during the
trial.
    In other words, under the standard for prejudice stated in
*Becton*, and considering these cases, a defendant need not prove
that he would have been found incompetent to establish
prejudice, he need only show he would have been entitled to a
hearing.  However, if the evidence clearly establishes that he
was competent, then no prejudice exists.

16

claimed that he did not remember committing a particularly heinous and "bizarre" crime involving beating and raping a 67-year old woman.  430 F. Supp. at 109-111.  The petitioner's counsel had met with his client "no more than three or four times, including court appearances," but noted that the petitioner appeared "confused, unresponsive, and suffering from withdrawal symptoms."  *Id*.  However, counsel never had the petitioner examined nor raised the competency issue to the court.  *Id*.  On review of the petitioner's habeas corpus motion, the district court concluded that counsel was ineffective in not addressing competency because of the "bizarre nature" of the crime, the petitioner's apparent withdrawal symptoms, and counsel's observations.  *Id*. at 111-12.  "With minimal effort, counsel could have learned of the petitioner's low I.Q. scores."[16]  *Id*.

In *Becton*, the petitioner was similarly charged with raping an elderly woman, including "bizarre behavior."  920 F.2d at 1191-92.  The petitioner was also generally unresponsive to counsel.[17]  *See id*.  The Fourth Circuit held that counsel was

[16] Wood's IQ scores were very similar to Zakaria's, reflecting "borderline intelligence between dull to normal and moderately retarded."  430 F. Supp. at 111 n. 2.

[17] The petitioner was diagnosed with a "mixed personality disorder with some hysterical features and a history of substance abuse.  His IQ was tested at a level of 60."  920 F.2d at 1191.

ineffective because the record was "devoid of any investigation" into competency.  *Id.*

In *Basham v. United States*, No. 4:02-992-JFA, 2013 WL 2446104, at *53-55 (D.S.C. June 5, 2013), a petitioner with ADHD "and a host of other mental issues," argued that his counsel was ineffective for failure to request a competency hearing.  In contrast to *Wood* and *Becton*, petitioner's counsel had the petitioner evaluated by experts, and those "experts were saying he was competent."  *Id.*  Moreover, whenever *Basham* displayed odd courtroom behavior, counsel raised the issue of competency, and the court would suspend proceeding to assess competency.  *Id.* On review of the petitioner's § 2255 motion, the district court concluded that "where trial counsel's own experts were saying he was competent, . . . there really would have been no logical reason to let the government pass on that issue."  *Id.* ("[T]his court concludes that Swerling and Harris were well-aware of their ongoing obligation to bring to the court's attention any concerns that they had about Basham's competency.  In fulfilling that obligation, trial counsel decided that rather than assert a claim that Basham was incompetent with no evidence to support such claim, they would proceed in their representation of Basham

and raise the issue of competency whenever they saw a genuine issue.").[18]

In this case, the government argues that counsel *did* investigate Zakaria's competency, by having Dr. Donner evaluate Zakaria.[19]   ECF No. 86 at 6.   However, Ms. Engert admitted that she never questioned Zakaria's competency, and only approached Dr. Donner to assess a legal theory.[20]   This information alone, however, is not sufficient to establish that Ms. Engert's performance was deficient.   Although there is some evidence that

---

[18] In affirming the district court's opinion, the Fourth Circuit described the opinion as "thorough and well-crafted."  *United States v. Basham*, 789 F.3d 358, 368 (4th Cir. 2015).

[19] The government also argues that counsel made a tactical decision in not pursuing a competency hearing because "mental retardation alone is insufficient to command a finding of incompetency," citing *United States v. McDade*, 263 F. App'x 324, 326-27 (4th Cir. 2008).   However, this is an incorrect summary of *McDade*.   The Fourth Circuit was simply reviewing the factual background of the case, including the testimony of two opposing experts--one which stated that McDade suffered from mild retardation and the other who found him competent.   The district court found the latter more credible.   The Fourth Circuit emphasized that McDade "d[id] not ask us to determine as a matter of fact that he is not competent."   Moreover, McDade had a 18 U.S.C. § 4241 hearing which is the issue in this case.

[20] Even if counsel had Zakaria examined by Dr. Donner because of concerns about competency, there would still be an ineffectiveness issue because, unlike *Basham* in which counsel had several independent experts examine their client's competence, Dr. Donner only examined Zakaria's IQ and offered no opinion on competence.   Moreover, Dr. Donner did not evaluate Zakaria for any mental illnesses.   If counsel had concerns about competency, relying on this evaluation alone may have not been sufficient.

Ms. Engert may have questioned Zakaria's abilities,[21] she testified that she always believed that Zakaria was competent, even after Dr. Donner's report and speaking to Zakaria's family. Because Zakaria did not present any evidence at the hearing about any behavior or conversations that should have caused Ms. Engert to question his competency, the Court cannot conclude that she acted unreasonably in failing to investigate Zakaria's competency. *See Mann*, 66 F. Supp. 3d at 737-39 (counsel was not ineffective when he had no reason to question petitioner's competence).

Further, Zakaria has failed to establish prejudice. To establish *Strickland* prejudice a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. The government argues that there is no prejudice because "there is no indication that Zakaria would have been found incompetent."[22] ECF No. 86 at 8. The government, however, relies on the incorrect standard. Zakaria need not show that he would have been found incompetent, only that he would have had a hearing on competency. *See*

---

[21] She admitted that she was worried that he would be held to the standard of a reasonable person, and she wanted to understand "how his mind worked."

[22] At the hearing, Zakaria's counsel stated a similar standard when she informed the Court that she would not presenting evidence that Zakaria was incompetent at the time of his trial.

*Becton,* 920 F.2d at 1194 (Defective performance is established if it is shown that "[h]ad counsel taken reasonable steps to investigate, a hearing could have been held on the issue of . . . competency, and the *Dusky* standard would have been applied at that time.").

Under 18 U.S.C. § 4241(a), a court, shall grant "[a competency hearing] motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."

In determining whether there is reasonable cause, "a trial court must consider all evidence before it, including evidence of irrational behavior, the defendant's demeanor . . . and medical opinions concerning the defendant's competence." *United States v. Mason,* 52 F.3d 1286, 1289-90 (4th Cir. 1995); *see also United States v. Snead,* No. 11-5100, 2012 WL 5417555, at *232 (4th Cir. Nov. 7, 2012). "[E]ven one of these factors standing alone may, in some circumstances, be sufficient." *Drope v. Missouri,* 420 U.S. 162, 171-72 (1975). "Medical opinions are usually persuasive evidence on the question of whether a sufficient doubt exists as to the defendant's competence to

require a competency hearing." *United States v. General*, 278 F.3d 389, 398 (4th Cir. 2002) (*quoting Mason*, 52 F.2d at 1290).

Whether reasonable cause exists is within the discretion of the district court. *Mason*, 52 F.3d at 1289. "The trial court must 'look at the record as a whole and accept as true all evidence of possible incompetence' in determining whether to order a competency hearing." *Id.* (quoting *Smith v. Ylst,* 826 F.2d 872, 877 (9th Cir.1987)).

The only evidence of Zakaria's competency is Dr. Donner's report. However, Dr. Donner made no determination about Zakaria's competency; he only stated that Zakaria had a low IQ, a learning disability, and cognitive disabilities. Moreover, the report reflected that Zakaria was responsive and could interact with the examiner, and that Zakaria's highest grade in school was in moral education--which likely required some understanding of right vs. wrong and reasoning ability. Thus, because no further evidence was presented at the evidentiary hearing, Zakaria has failed to show that but-for Ms. Engert's actions he would have been entitled to a *Dusky* hearing.

C. Zakaria's "Lack of Understanding" Claim

At the evidentiary hearing, counsel argued that Zakaria failed to understand the options available to him because of the language barrier, cultural differences, his cognitive deficiencies, and the complexity of the legal system. However,

22

this argument does not address how Ms. Engert was deficient. Although counsel later asserted that Ms. Engert should have made sure that Zakaria understood his choices and consulted with Dr. Donner, counsel failed to ask *any* questions showing that Ms. Engert had any reason to question Zakaria's understanding.  Ms. Engert stated that she never felt Zakaria did not understand her and that there were some back-and-forth discussions.  Moreover, Zakaria never testified that he told Ms. Engert that he did not understand, and Dr. Donner's report shows that Zakaria tries to hide his deficiencies.  There is simply no available evidence on which the Court could conclude that Ms. Engert acted unreasonably.

Zakaria also failed to show any prejudice in relation to this claim.  In his brief and at the hearing, Zakaria argued that but-for his lack of understanding, he would have cooperated with the government and entered into a plea agreement.  "In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012); *see also Hill v. Lockhart*, 474 U.S. 52, 59 (1985) ("The . . . 'prejudice' requirement . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process"). Here, as was the case in *Lafler*, "[h]aving to stand trial, not choosing to waive it, is the prejudice alleged."

*Lafler*, 132 S. Ct. at 1385.   Therefore, Zakaria "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed."   *Id.*

Zakaria has established that a plea was offered.   However, he has not established that but-for Ms. Engert's performance he would have accepted the plea.   In fact, Zakaria's testimony shows that he did not accept the plea for reasons entirely independent of Ms. Engert's representation.   Zakaria did not cooperate with the government because of the advice of his family.   Zakaria's family told him not to cooperate with the government, to go to trial, and nothing bad would happen. Zakaria's conversations with Ms. Engert in which he was determined to go to trial and thought he would prevail reflected this advice.

Further, at the hearing, Zakaria stated that he would not have told the government about his brother, but would have provided information about his cousin, specifically that his cousin packed his bag with the drugs.   However, the government

24

was well aware of this information because it was one of
Zakaria's central arguments at trial.  Therefore, it is unlikely
that without more, the government would have agreed that
Zakaria's proffer was sufficient under the safety valve
provision.  There is no evidence that Ms. Engert's actions
prejudiced Zakaria in any way.

   D. Zakaria's Claim that Counsel Failed to Present Mitigating
      Evidence at Sentencing

   Zakaria's final argument is that his counsel erred in not
presenting his low IQ as a mitigating factor at sentencing.
Despite Zakaria's assertion, the undisputed facts show that
counsel did raise the issue of Zakaria's low IQ in her
sentencing memorandum, and specifically drew the Court's
attention to Dr. Donner's report.  Moreover, even if there was
error, Zakaria cannot establish prejudice because he received
the mandatory minimum sentence for his crimes.  *See* 21 U.S.C. §
841(b)(1)(A); 21 U.S.C. § 960.

   E. Certificate of Appealability

   A certificate of appealability ("COA") must issue before a
petitioner may appeal the court's decision in a § 2255 case.
*See* 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).  A COA may be
issued "only if the applicant has made a substantial showing of
the denial of a constitutional right."  § 2253(c)(2).  The
petitioner "must demonstrate that reasonable jurists would find

the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (*quoting Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (internal quotation marks omitted).   Denial of a COA does not prevent the petitioner from seeking permission from the Court of Appeals to file a successive petition or pursuing his claims upon receipt of such permission.

Because Zakaria has not made a substantial showing of the denial of his constitutional rights, the Court will not issue a COA.

III. Conclusion

For the reasons stated above, the Court will deny Zakaria's motion to amend, correct, or set aside his sentence under 28 U.S.C. § 2255.

_10/22/15_
Date

William D. Quarles, Jr.
United States District Judge